ALMON, Justice.
The defendant insurance companies appeal from a judgment on a jury verdict awarding $2,000 compensatory damages and $400,000 punitive damages on the plaintiff’s claims of conversion and conspiracy to commit conversion. The plaintiff submitted evidence, and the jury found, that the defendants forged his signature on a check. The principal issues are whether the trial court erred in submitting the claims to the jury or in its instructions to the jury.
James G. Veal suffered a work-related injury while driving a truck in the line and scope of his employment. Veal was forced off the road to avoid colliding with a pickup truck driven by Charles Watkins. Veal retained an attorney, Ron Booth, both to claim workers’ compensation benefits from his employer, which was insured by the defendant Cigna Companies, Inc., and to claim damages from Watkins, who was insured by the defendant Alfa Mutual Insurance Company. Sheila McDonald, an Atlanta claims representative for Cigna, acknowledged receipt of the workers’ compensation claim and forwarded it to Cigna’s attorney. Ken Harper, a senior claims adjuster for Alfa, acknowledged receipt of a letter from Booth regarding Veal’s potential claim against Watkins.
On July 14, 1987, a judgment was entered on a settlement of the workers’ compensation claim. On July 29, Harper mailed Booth a letter informing him that *1294 Watkins’s policy limits were $20,000 and stating: “Cigna is mailing me their subro-gation file this week and once I have this information I will be in a position to settle with you.” Also on July 29, McDonald wrote Harper, sending him the subrogation papers and informing him that the compensation payments totalled $15,225.37. On August 19, Harper sent Cigna a $15,225.37 check payable to Cigna and Veal, and he sent Booth a $4,774.63 check payable to Veal and Booth. Both checks included a release on the back that required the endorser to release all claims against Watkins in order to negotiate the check. This action arises from the issuance and handling of the check that was sent to Cigna. The check was negotiated over a writing that purported to be Veal’s signature. Veal denied having signed the check and presented expert testimony that his purported signature was a forgery.
Booth testified that he received the $4,774.63 check from Alfa on August 26 and promptly telephoned Harper. Booth sent Harper the following letter to memorialize the conversation and to return the check:
“As per our conversation, it is my understanding you are retrieving the draft that was sent to Cigna Property and Casualty Company and I have enclosed the draft sent to my office. I have scheduled an appointment with my client to fully explain the offer of settlement and will advise you as soon as possible.”
Booth testified that Harper telephoned him on August 28 and stated the following: “I talked to the lady at Cigna and she said that we have got our money. The draft has already cleared, and we’re not giving it back.” Cigna’s deposit receipt shows that the check was deposited on August 31.
McDonald testified that her records indicate that she received the $15,225.37 check on August 24, 1987:
“A. The computer date is August 24th of ’87, it says ‘8-19-87, received draft in the amount of $15,225.37 from Alfa Insurance to cover subro claim.’ And in parenthesis is a draft No. C367207. SCM.
“Q. Okay. Now, the date — tell me from that entry there, what was the date that draft was received by Cigna?
“A. August 24th of ’87 is how the computer indicates it.
“Q. Okay. And that was an entry made by yourself?
“A. That is correct.
“Q. And, now, what is the 8-19-87 date? ...
“A. That is the date on the check itself, the date it was issued.”
' Harper’s cover letter for the check is addressed to Cigna’s Atlanta office. The reverse side of the check includes the notation, “Rec. RSI Atlanta 8/28/87.” “RSI” is Cigna’s Recovery Services Department, which processes checks. McDonald testified:
“Q. So, all the mail is opened prior to getting to you?
“A. Yes.
“Q. And if there is a check inside, what happens to it?
“A. It goes to RSI.
“Q. Okay. And somebody makes you a copy and sends it to you so that you will know that it has been received?
“A. Yes.
“Q. But as far as receiving the actual check, you have never seen the actual check?
“A. I have never seen the live check, no.”
McDonald denied that Harper telephoned her about retrieving the check:
“Q. Following your entry here on computer, 8-24-87, where you note that the draft had been received and you just said because you got a copy of it, did you have any conversation with Ken Harper?
“A. No, I did not.
“Q. Did he ever call over to Atlanta and say, ‘I need that draft back’?
“A. Never did.”
Thus, McDonald denied seeing the check itself and denied talking to Harper about retrieving the check. Veal presented evi- *1295 denee, however, that both Harper and McDonald had examples of his signature in their files and argued that, therefore, either one of them could have forged his signature. He argues that, in any event, the wrongful appropriation of the check could have been accomplished only by a conspiracy between Harper and McDonald. He argues that the misappropriation of the check could not have occurred if Harper had sent both checks to Booth for Veal’s signature instead of sending one check directly to Cigna. He also argues that Harper could have stopped payment on the Cigna check after Booth notified him that Veal would not agree to the release, and that his failure to do so or to otherwise retrieve the check was not satisfactorily explained. On September 28, Harper wrote the following to Booth:
“Enclosed you will find a copy of our draft to Cigna Property and Casualty showing that Mr. Veal did endorse this draft. Based on this information I would like to pay the balance of our policy limits in the amount of $4,774.63 and conclude this claim.”
As to Cigna’s liability, Veal argues that McDonald either forged his signature onto the check or at least knew that Veal had not endorsed it, because the check had come directly from Alfa, not through Veal. He argues that the delay of four days from Cigna’s receipt of the check on August 24 until RSI’s receipt of the check on August 28 shows that McDonald had the opportunity to forge his signature. He also argues that the jury could have believed from Booth’s testimony either that Harper did talk to McDonald about retrieving the check, contrary to her testimony, or that Harper did not ask her to retrieve the check, but had conspired with her and lied to Booth.
Alfa and Cigna argue that the evidence failed to establish the elements of conversion and conspiracy and that, therefore, the trial court erred in denying their motions for directed verdict and for judgment notwithstanding the verdict. They cite Johnson v. Life Ins. Co. of Alabama, 581 So.2d 438, 442 (Ala.1991); Ligon Furniture Co. v. O.M. Hughes Ins., Inc., 551 So.2d 283 (Ala.1989); Knox v. Moskins Stores, Inc., 241 Ala. 346, 2 So.2d 449 (1941), and other cases for the principles that an action for conversion will lie only in regard to specific, identifiable property as to which the plaintiff has an immediate right of possession. They argue that Veal cannot recover for conversion of the funds represented by the $15,225.37 draft, because those funds were not specific, earmarked funds, see Johnson, supra; for conversion of the draft itself, because he disclaimed the draft and in fact returned the one that was sent to him; or for conversion of the chose in action against Watkins that was purportedly released by negotiation of the draft, because a chose in action is not specific, identifiable property, citing Peavy Lumber Co. v. Murchison, 272 Ala. 251, 130 So.2d 338 (1961).
These arguments are not well taken, however, because the draft itself was specific, identifiable property that represented valuable property rights Veal had in regard to Cigna’s subrogation claim against him and his personal injury claim against Alfa’s insured. By drafting the check so as to terminate Veal’s rights in regard to Cigna’s subrogation claim and his rights against Watkins, Harper created a negotiable instrument that represented valuable property rights belonging to Veal. Veal’s evidence supports his claim that the defendants then wrongfully exercised dominion over the check and thereby over Veal’s property rights represented by the check.
The defendants cite Peavy Lumber, supra, for the proposition that Alabama does not recognize a cause of action for the conversion of a chose in action. The Court in Peavy Lumber stated:
“[A] thing in action is designated a chose in action_ A thing in action is properly distinguished from a thing in which the owner has the actual or constructive possession, but for which an action may be brought to reduce it to possession. It is commonly termed a chose in action, and is a personal right to demand money or property by an action.”
*1296 272 Ala. at 253, 130 So.2d at 340. The Court in Peavy Lumber was not addressing a conversion action, however, but an attempt by a judgment creditor to claim funds paid into court as to which there were conflicting claims under mechanics’ and materialmen’s liens. The Court said:
“Therefore, the question arises, was the unpaid balance which is undisputedly owing to the general contractor, R.N. Dalrymple, subject to levy and sale under execution, or was it exempt as a result of being a ‘thing in action’? We think that the unpaid balance due the general contractor pursuant to the construction contract between the owner and the general contractor, was a thing in action and not subject to levy and sale under execution. The sum due under the upaid balance to the general contractor did not become money in the hands of the judgment debtor and become property subject to levy and sale under execution.”
272 Ala. at 254, 130 So.2d at 341. Thus, Peavy Lumber is distinguishable from this case. In some circumstances, it might be appropriate to say that a chose in action is not capable of “actual or constructive possession” and is thus not subject to conversion. In this case, however, Veal clearly had an actual right to possession of the check and the right to endorse it or not, as he chose. The defendants’ wrongful interference with his right to possession of the check affected his substantial property interests in regard to the subrogation claim and his claim against Watkins.
In certain circumstances, a wrongful taking of intangible property will support a conversion action. In National Surety Corp. v. Applied Systems, Inc., 418 So.2d 847, 850 (Ala.1982), this Court held that computer programs could be subject to conversion:
“There was sufficient evidence from which the jury could have concluded that the actual tapes were converted and then copied and returned. But, if the jury based its decision on the conclusion that only the programs were taken, we could not say they were in error. In appropriate circumstances, intangible personal property can be converted, as would appear to be the case here.”
In Raley v. Royal Insurance Co., 386 So.2d 742 (Ala.1980), the Court allowed a conversion action to lie where an insurance company paid a mortgagee fire insurance proceeds and took an assignment of the mortgage. “[W]hen Royal Globe had possession of the mortgage, and failed to have it satisfied for almost two years, it was interfering with Raley’s right of possession of his property, and was therefore guilty of conversion.” 386 So.2d at 743. In Ballenger v. Liberty National Life Ins. Co., 266 Ala. 407, 409, 96 So.2d 728, 729 (1957), the Court ordered an action “for the conversion by [Liberty National] of certain shares of stock allegedly owned by the plaintiff” to be returned to the law side of the court, holding that the defense of laches did not apply so as to justify the transfer to equity. The plaintiff’s stock in Liberty National was represented only by a share of stock of J.N. Brown Burial Benefit Association, Inc., which had become Brown Service Insurance Company, Inc., and had then merged with Liberty National. The conversions of the computer programs, the rights under the mortgage, and the stock are analogous to the conversion of Veal’s rights represented by the check, and the cases cited above support the submission of Veal’s case to the jury. Thus, the trial court did not err in denying Alfa and Cig-na’s motions for directed verdict and for judgment notwithstanding the verdict.
The defendants also argue that no damages were proven. They cite Moore v. Liberty National Life Ins. Co., 581 So.2d 833 (Ala.1991). In Moore an agent of the insurer obtained loans on the insured’s policy by forging the insured’s signature. The insurer canceled those loans when the insured notified it of the problem, however, and did so before the insured brought an action. Here, the defendants forced Veal to trial to establish the forgery of his signature. If he had not filed this action or, for that matter, if he had not won it, the attempted conversion would have been successful. Under the circumstances, Veal *1297 suffered at least nominal, if not actual, damage. Thus, the motions for j.n.o.v. were not due to be granted on this ground either.
Alfa and Cigna argue, alternatively, that the trial court erred in instructing the jury. The charge included the following statement:
“The signature, James G. Veal, on the reverse side of the draft dated August 19, 1987, at issue in this case is personal property which may be the subject of conversion under Alabama law.”
This charge came from a written requested charge submitted by Veal. In a conference on the requested jury charges, the defendants had objected to the giving of this charge, stating that “a signature cannot be converted.” After the jury charges, the defendants stated that they were reiterating the objections made at the charge conference and asked if the judge considered them as being preserved, and he responded, “That’s right.”
As can be seen from our analysis above, the cause of action on which Veal’s action may lie is the conversion of the check and the property rights represented thereby. That conversion was accomplished by means of the forgery of Veal’s signature; the facts do not support a claim of conversion of Veal’s signature. This distinction is important in this case, because Veal’s theory of the case changed during the course of trial. At one point, Veal was in fact seeking to recover on a claim of conversion of his signature. This instruction therefore cannot be held harmless in view of the entire instructions to the jury. The trial court erred in giving this instruction over the defendants’ objection, and the judgment is therefore due to be reversed for the failure to grant a new trial on this ground.
1910769 — REVERSED AND REMANDED.
1910826 — REVERSED AND REMANDED.
HORNSBY, C.J., and SHORES and KENNEDY, JJ., concur.
HOUSTON, STEAGALL and INGRAM, JJ., concur in the result.